BEER, Judge.
Plaintiff-appellant, Eula Mae Trim was injured in a bus-automobile collision on September 23, 1971. Liability was stipulated. On appeal she seeks an increase in general damages and her husband seeks an increase in special damages primarily because of their thus far judicially unrecognized contention that Mrs. Trim is suffering from thoracic outlet compression syndrome [1] caused or aggravated by the accident.
Dr. James Nix saw plaintiff from October 8, 1971 through April 6, 1972. She registered complaints of pain in her neck, left arm and back as well as numbness in her hand. He diagnosed her condition as sprain in the cervical, lumbar, and trapezius regions and presumed that these were caused by the accident.
Dr. Kenneth Vogel, a neurosurgeon, first saw plaintiff on December 16, 1971 with follow-up visits on March 24, 1972 and January 15, 1973. She registered complaints of cervical and lumbo-sacral discomfort and a sensation of numbness in the left hand and leg. He believed that she had sustained an acute cervical and lumbo-sa-cral strain and recommended physio-therapy including cervical traction. On her last visit to his office he noted that she was still experiencing pain in the left cervical region.
*368 Dr. Hyman Soboloff first saw Mrs. Trim in May, 1972. She complained of radiation of pain in her left palm. He found no muscle spasm nor any other objective findings, noting only her subjective complaints. At that time she made no complaint of numbness. He concluded that she had experienced complete recovery from the injuries of September 23, 1971. He did, nevertheless, recommend neurological examination because of her complaints of dizziness.
' None of these physicians diagnosed or apparently suspected that Mrs. Trim was suffering from thoracic outlet compression syndrome nor could they, perforce, relate such condition to her accident. The same can be said of Dr. Richard Levy, a neurosurgeon, who saw her on July 30, 1974. At that time she related complaints of early morning dizziness and numbness in her left hand that subsided as the day progressed. Neurological examination revealed no objective symptoms. There was no muscle spasm and she was able to move her neck through a full range of motion. He found no loss of muscle power or tendon reflexes and x-rays of the cervical spine showed no disability.[2]
Notwithstanding the fact that none of these well recognized expert medical witnesses diagnosed thoracic outlet compression syndr.ome, appellants, nevertheless, rely heavily on the testimony of Dr. Warren Gottsegen, an expert in vascular surgery,[3] who saw Mrs. Trim on two widely spaced occasions: first in August, 1972 and finally in November, 1974. Examination on the first visit indicated pain and numbness in her arms and hands on raising of her arms away from the body (a possible sign of thoracic outlet compression syndrome) but resulted in no specific diagnosis. On the subsequent examination, over two years later, there was a finding of symptoms similar to those first observed in the August, 1972 examination coupled with findings of loss of circulation in her hand and loss of pulse in her wrist. Her anteri- or scalene muscles were in spasm and drew her first and second ribs up against her collarbone compressing the arteries, veins and nerves passing through these ribs. These findings, when considered along with the history and background information given by Mrs. Trim, resulted in the final diagnosis of left thoracic outlet compression syndrome, apparently caused or aggravated by the accident of September 23, 1971.
In explaining the delayed manifestation of this condition during the time between the two widely spaced examinations, Dr. Gottsegen noted that such “might be a little unusual . . . but, we have seen it take that long for a full grown outlet syndrome to develop.” He believed that this particular syndrome usually manifests itself considerably closer to the date of trauma — if it is trauma related — but felt that similar situations have occurred in isolated circumstances because muscle spasm can be intermittent and increase and subside for various periods of time. Thus, he does relate the positive finding of left thoracic outlet compression syndrome to the original injury of September 23, 1971.
As to the lack of these findings (and, perforce, the non-diagnosis of the syndrome) by the other physicians, Dr. Gott-segen observed:
“The orthopedist and neurosurgeon don’t ordinarily look for this type of muscle spasm or in this particular group *369 of muscles until it is absolutely full blown and very obvious.”
The record discloses that by May of 1972 Mrs. Trim had returned to full employment as a nurse’s aide and continued (with certain interruptions unrelated to the issues in this litigation) until her hospitalization by Dr. Gottsegen for the corrective surgery of December, 1974, which was, in his opinion, required to deal with the thoracic outlet compression syndrome. Since her only absence from working during the period between May, 1972 and December, 1974 is unrelated to this claim, the implication is apparent that she was not — after May of 1972 — disabled as a result of the injuries received in the accident of September 23, 1971. She had, in the general medical opinions noted previously, essentially recovered to a degree sufficient to perform her nurse’s aide duties.
Essentially, the issue before us is whether the trial court erred in not affirmatively responding to those portions of plaintiffs’ claim for general and special damages which are attributable to the pain and suffering caused by thoracic outlet compression syndrome and the obviously related need for the corrective surgery performed by Dr. Gottsegen, as well as the subsequent discomfort and need for treatment of the postoperative complications experienced by Mrs. Trim. These complications were dealt with by Dr. Raul Montemayer who cared for plaintiff postoperatively in consultation with Dr. Gottsegen.
While at least one other medical expert witness seems to acknowledge that symptoms of which plaintiff then complained could, in retrospect, have indicated thoracic outlet compression syndrome, none, other than Dr. Gottsegen, affirmatively relates them to the accident for which Public Service is admittedly responsible. Dr. Gott-segen acknowledges that such late development of the condition is. unusual but does attempt to give a plausible explanation as to why his final diagnosis of thoracic outlet compression syndrome was not reached until three years after the accident.
If Mrs. Trim’s thoracic outlet compression syndrome did, in fact, result from the accident of September 23, 1971 it would be an act of prodigious insensitivity to judicially disregard the resultant pain and suffering and the medical, surgical, hospital, and related costs of dealing with the painful condition even though the final diagnosis was made long after the accident. However, it is obvious from the judgment that the trial judge either determined that the thoracic outlet compression syndrome was not a proximate result of the accident or, alternatively, determined that although it might be possible that the thoracic outlet compression syndrome was either caused or aggravated by the accident, the burden of proving same by a preponderance of the evidence was not successfully carried by Mrs. Trim.
We are unable to completely agree with the somewhat simplistic argument of able counsel for NOPSI who forcefully contends that this case is nothing more than one which must be resolved on the basis of the holding in Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963). Likewise, we are not in total accord with the contentions of able counsel for Mr. and Mrs. Trim to the effect that Dr. Gottsegen’s testimony must be regarded as uncontradicted and entitled to greater weight than that of the other practitioners, thus having the effect of shifting the burden of proof from plaintiff to defendant.
We conclude that the trial court, confronted by truthful but, nevertheless, apparently conflicting lay and expert testimony, ultimately resolved the conflicting testimony and evidence (which he heard and examined first hand) by concluding that Mrs. Trim’s pain and suffering, and Mr. Trim’s substantial expenditures, related to thoracic outlet compression syndrome were *370 not, to an acceptable degree of legal certainty, the proximate result of the accident of September 23, 1971. A painstaking examination of the record leaves us with no compelling conviction that the trial court’s ultimate determination is either unsupported by the evidence or clearly at odds with it. This is not to say that we would not make a similar (or perhaps identical) observation if the trial court had opted in favor of recognizing the accident as proximately causing her thoracic outlet compression syndrome. Perhaps that very observation is the most impelling reason for us to conclude that the judgment, close call that it obviously is, must be affirmed, each party to pay its own costs of this appeal.

AFFIRMED.

REDMANN, J., dissents.

. For a very detailed description of Thoracic Outlet Compression Syndrome including signs' and symptoms, diagnosis, and treatment, see Louisiana State Bar Journal, Vol. 20, p. 187 et seq. (December 1972). This article, by Drs. Rosenberg, Glass and Gottsegen forms a part of the record in these proceedings.

. It should, however, be noted that Dr. Levy does acknowledge that Mrs. Trim’s subjective complaints were, in retrospect, “suggestive of a person who subsequently developed a thoracic outlet syndrome.”

. One of the authors of the article referred to in footnote 1.